*15-1890-cv*
*Doe v. Hagenbeck*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2015

(Argued: June 16, 2016          Decided: August 30, 2017)

No. 15-1890-cv

_____

JANE DOE,

*Plaintiff-Appellee,*

-v.-

LT. GEN. FRANKLIN LEE HAGENBECK,
BRIG. GEN. WILLIAM E. RAPP,

*Defendants-Appellants,*

UNITED STATES OF AMERICA,

*Defendant.*

_____

Before:      WESLEY, LIVINGSTON, and CHIN, *Circuit Judges.*

Appeal from an April 13, 2015 order of the United States District Court for the Southern District of New York (Hellerstein, *J.*), granting in part and denying in part Defendants' motion to dismiss.   Plaintiff-Appellee Jane Doe — a former West Point cadet who alleges that she was sexually assaulted by another cadet — brought a *Bivens* action against two superior officers at West Point,

Defendants-Appellants Lieutenant General Franklin Lee Hagenbeck and Brigadier General William E. Rapp, in their personal capacities, for alleged violation of her Fifth Amendment right to equal protection. Because adjudicating Doe's claim would require judicial interference into a wide range of military functions (including the training, supervision, discipline, education, and command of service personnel at West Point), triggering the incident-to-service rule, we conclude that there is no *Bivens* remedy available in this context. Accordingly, the order of the district court is **REVERSED**, and the case is **REMANDED** with instructions to dismiss.

JUDGE CHIN dissents in a separate opinion.

| | |
|---|---|
| FOR PLAINTIFF-APPELLEE: | REBECCA OJSERKIS, JONAS WANG, Erin Baldwin, Kathryn Wynbrandt, Bethany Li, Michael J. Wishnie, Veteran Legal Services Clinic, Jerome M. Frank Legal Services Organization, Yale Law School, New Haven, CT, *for Jane Doe*. |
| FOR DEFENDANTS-APPELLANTS: | CHRISTOPHER CONNOLLY, Benjamin H. Torrance, Assistant United States Attorneys, New York, NY, for Joon H. Kim, Acting United States Attorney for the Southern District of New York, *for Lt. Gen. Franklin Lee Hagenbeck and Brig. Gen. William E. Rapp*. |
| AMICI CURIAE: | Caitlin J. Halligan, Joel M. Cohen, Casey K. Lee, Kathryn M. Cherry, Gibson, Dunn & Crutcher LLP, New York, NY, *for Amici Curiae* Federal Courts and Constitutional Law Professors, *in support of Jane Doe*. |
| | Paul W. Hughes, Travis Crum, Mayer Brown LLP, Washington, D.C., *for Amici* |

*Curiae* University Administrators, *in support of Jane Doe*.

Penelope A. Preovolos, Ben Patterson, Morrison & Foerster LLP, San Francisco, CA, *for Amici Curiae* Former Military Officers, *in support of Jane Doe*.

John D. Niles, James Anglin Flynn, Covington & Burling LLP, Washington, D.C., *for Amici Curiae* National Veterans Legal Services Program, Protect Our Defenders, Service Women's Action Network, *in support of Jane Doe*.

Sandra S. Park, Steven Watt, Lenora M. Lapidus, American Civil Liberties Union Foundation, New York, NY, *for Amici Curiae* American Civil Liberties Union, American Association of University Women, Human Rights and Gender Justice Clinic at the City University of New York School of Law, Human Rights Watch, National Alliance to End Sexual Violence, National Center on Domestic and Sexual Violence, National Women's Law Center, *in support of Jane Doe*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Jane Doe is a former United States Military Academy ("West Point") cadet who alleges that during her second year at West Point, she was sexually assaulted by a fellow cadet. She filed this lawsuit not against the cadet, but

against two superior officers, Lieutenant General Franklin Lee Hagenbeck and Brigadier General William E. Rapp, in their personal capacities. Lieutenant General Hagenbeck was Superintendent of West Point from approximately July 2006 to July 2010, and in that role he chaired the Sexual Assault Review Board, which is the "primary means of oversight" of the sexual assault prevention and response program at West Point. Joint App'x 12. Brigadier General Rapp was Commandant of Cadets at West Point from 2009 to 2011 and was in charge of the administration and training of cadets. Doe alleges, in substance, that Lieutenant General Hagenbeck and Brigadier General Rapp "perpetrat[ed] a sexually aggressive culture" at West Point that "discriminated against female cadets," "put female cadets at risk of violent harm," and resulted, *inter alia*, in her sexual assault. *Id*. at 29.

In 2013, Doe filed suit against the United States, Lieutenant General Hagenbeck, and Brigadier General Rapp. She pleaded four causes of action, but the district court dismissed all but one: a claim against Lieutenant General Hagenbeck and Brigadier General Rapp brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), on the basis of their alleged violation of equal protection rights protected by the Fifth

4

Amendment. For the reasons stated below, we conclude that the district court erred in permitting this *Bivens* claim to proceed. We therefore REVERSE the order of the district court as to this claim and REMAND the case to the district court with instructions to dismiss it.

## BACKGROUND

### I. Factual Allegations[1]

Doe, who graduated from high school in 2008, received an offer of admission to West Point during her senior year, which she accepted. As a West Point cadet, Doe was a member of the Army. 10 U.S.C. § 3075(b)(2). The expectation upon enrollment was that, following her military training and education at West Point — which, together with room and board, Doe received without charge — she would serve at least five years of active duty. The West Point curriculum, as Doe alleges in her Amended Complaint, "is designed to train 'officer-leaders of character to serve the Army and the Nation.'" Joint App'x 13.

---

[1] The factual background presented here is derived from the allegations in Doe's Amended Complaint, which we accept as true and view in the light most favorable to her in reviewing the district court's decision on the motion to dismiss. *See Starr Int'l Co. v. Fed. Reserve Bank*, 742 F.3d 37, 40 (2d Cir. 2014).

Upon arrival at West Point, Doe, who was one of about 200 women among the approximately 1,300 cadets in her class, alleges that she encountered what she describes as a "male" and "misogynistic culture." *Id.* at 14, 15. Cadets, for example, sang sexually explicit and offensive chants while marching on campus, "in view and earshot of faculty and administrators." *Id.* at 16. Doe contends that she "observed her cadet classmates making misogynistic and sexually aggressive comments on a regular basis," while "[t]he West Point administration frequently ignored and sometimes condoned these comments." *Id.* at 15. Doe does not allege that Lieutenant General Hagenbeck or Brigadier General Rapp engaged in any such conduct, but she does contend that they "created" the culture there, which "marginalized" Doe and other female cadets and "caused them to be subjected to routine harassment, [to] suffer emotional distress and other harms, and [to] be pressured to conform to male norms." *Id.* Doe also maintains that West Point's training on sexual assault and harassment was inadequate "and did little to combat the overwhelmingly misogynistic culture of the school." *Id.* at 17.

In the early morning of May 9, 2010, during her second year at West Point, Doe alleges that she was raped by a fellow cadet with whom she had gone

6

walking after hours. In particular, Doe asserts that after taking a prescribed sedative as she was preparing for bed, she agreed at about 1:00 a.m. to leave her dormitory with this cadet (identified by Doe in her Amended Complaint only as "Mr. Smith" ("Smith")) in violation of West Point rules. Doe alleges that she accepted only a few sips of alcohol from Smith but that, as a result of the combined effects of the sedative and the alcohol, she "began to lose awareness of her surroundings and consciousness of what she was doing." *Id.* at 22. Doe contends that Smith "was aware that [she] had lost consciousness and took advantage," attacking her and having "forcible, non-consensual intercourse with her." *Id.* She also maintains that she does not remember the details of the attack.

Doe sought care from West Point's cadet health clinic the next day, which provided her with emergency contraception and, on a subsequent visit on or about May 11, tested her for sexually-transmitted diseases. Although the treating nurse allegedly informed Doe that she had signs of vaginal tearing, and the medical record indicates Doe reported that she "was sexually assaulted by a friend," Doe states that the clinic "did not perform any forensic collection or preservation of evidence of the sexual assault." *Id.* at 23. During a regular

appointment with her psychiatrist that day (a psychiatrist Doe began consulting, she alleges, because of the significant stress she suffered due to West Point's oppressive atmosphere), Doe reported "nonconsensual sexual relations with a friend," and was referred to West Point's Sexual Assault Response Counselor, Major Maria Burger. *Id.*

Doe met only once with Major Burger. During that meeting, the major explained to Doe that she could file either an "unrestricted" or a "restricted" report about the incident. *Id.* An unrestricted report would have included both Doe's and her alleged assailant's names and would have been given to commanders for potential disciplinary action. A restricted report would preserve their anonymity, but would not result in a referral. Doe filed a restricted report. She alleges in her Amended Complaint that she feared reputational harm or even retaliation from other cadets if she filed an unrestricted report. She also worried that she would be punished for having been out after hours and for consuming alcohol with her alleged assailant, and that an unrestricted report would damage her career prospects because "[i]t was common knowledge among the cadets that successful women in the military did not report incidents of sexual assault." *Id.*

Doe contends that in the aftermath of the sexual assault, her anxiety grew intolerable. Doe informed West Point that she would resign, and on August 13, 2010, she was honorably discharged. Doe thereafter enrolled in a civilian college from which she earned a degree.

## II. Procedural History

On April 26, 2013, Doe filed a complaint in the United States District Court for the Southern District of New York (Hellerstein, *J.*).[2] On September 4, 2013, she filed an Amended Complaint. Therein, Doe pleaded four independent causes of action: (1) a *Bivens* claim based on an alleged Fifth Amendment due

---

[2] A redacted version of the Complaint was docketed, and an unredacted version was filed under seal. The district court ordered the parties to show cause why the Complaint should remain under seal, and Doe then filed a motion to seal the case. At a hearing, the district court granted the motion in part, and denied it in part. It granted Doe permission to proceed under a pseudonym, and it also ruled that she could continue to redact from public filings the name of "Mr. Smith," the man she alleged had assaulted her. The district court decided that the names of the individual defendants and the facts and circumstances of the alleged assault, however, should be disclosed. No challenge has been presented on appeal to this manner of proceeding and we are without the benefit of briefing on the question. We assume, *arguendo*, that the district court did not abuse its discretion in determining to proceed in this manner and do not address the matter further. *But see, e.g.*, *Doe v. Public Citizen*, 749 F.3d 246, 275 (4th Cir. 2014) (holding that the district court's sealing order "violated the public's right of access under the First Amendment and that the [district] court abused its discretion in allowing Company Doe to proceed under a pseudonym"); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (indicating that "'[t]he people have a right to know who is using their courts,'" and describing "the relevant inquiry as a balancing test that weighs the plaintiff's need for anonymity against countervailing interests in full disclosure" (quoting *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997))).

process violation against Lieutenant General Hagenbeck and Brigadier General Rapp; (2) a *Bivens* claim premised on an alleged Fifth Amendment equal protection violation against Lieutenant General Hagenbeck and Brigadier General Rapp; (3) a claim for breach of the covenant of good faith and fair dealing under 28 U.S.C. § 1346(a)(2) (the "Little Tucker Act") against the United States; and (4) a Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, claim against the United States alleging negligent supervision, negligent training, negligence, negligent infliction of emotional distress, and abuse of process.

On September 20, 2013, defendants filed a motion to dismiss the Amended Complaint, which Doe opposed. On April 13, 2015, the district court issued an opinion and order granting in part and denying in part defendants' motion. The district court granted defendants' motion as to the two claims against the United States: the Little Tucker Act claim and the FTCA claim. The district court also dismissed Doe's *Bivens* claim asserting a violation of her due process rights. These claims are not at issue in this interlocutory appeal.

The district court denied the motion to dismiss as to the *Bivens* claim in which Doe asserted that Lieutenant General Hagenbeck and Brigadier General

10

Rapp violated her equal protection rights. The district court acknowledged that a *Bivens* remedy is not available "when 'special factors counselling hesitation' are present," *Chappell v. Wallace*, 462 U.S. 296, 298 (1983) (quoting *Bivens*, 403 U.S. at 396). It recognized that absent Congressional authorization for a money damages claim, "[t]he need to insulate the military's disciplinary structure from judicial inquiry" constitutes a special factor. *Doe v. Hagenbeck*, 98 F. Supp. 3d 672, 684 (S.D.N.Y. 2015). Further, the court acknowledged the Supreme Court's instruction, in *United States v. Stanley*, that in the military context, the special factors requiring abstention "extend [even] beyond the situation in which an officer-subordinate relationship exists, and require abstention in the inferring of *Bivens* actions as extensive as the exception to the FTCA" established in *Feres v. United States*, 340 U.S. 135 (1950), *Stanley*, 483 U.S. 669, 683–84 (1987). In the district court's view, however, "the primary reason for exercising judicial restraint with cases concerning the military is 'the need to preserve the military disciplinary structure and prevent judicial involvement in sensitive military matters.'" *Doe*, 98 F. Supp. 3d at 688 (quoting *Wake v. United States*, 89 F.3d 53, 57 (2d Cir. 1996)). The district court concluded that Doe's claim, at least at the motion to dismiss stage, did not implicate such concerns.

11

Following the district court's opinion, Lieutenant General Hagenbeck and Brigadier General Rapp filed a notice of interlocutory appeal and moved for a stay pending the appeal. In response, Doe argued that any appeal should be pursued in the Federal Circuit instead of in the Second Circuit. The district court granted the stay until August 7, 2015, "and such further period as the U.S. Court of Appeals shall determine." Joint App'x 9. The district court also "note[d] Plaintiff's position that any appeal should be pursued in the Federal Circuit[] instead of the Second Circuit" and "le[ft] that determination for the appellate courts." *Id.* A panel of this Court thereafter granted defendants' motion to stay the proceedings before the district court and denied Doe's motion to transfer venue.

## DISCUSSION

Doe's equal protection claim is based on the proposition that Lieutenant General Hagenbeck and Brigadier General Rapp, her superior officers at the time, "knowingly and intentionally created and enforced a policy and practice" at West Point that "discriminated against female cadets," "tolerated attacks against [them] and discouraged reporting," and promoted a "sexually aggressive culture" there that caused Doe to suffer, *inter alia*, a sexual assault. Joint App'x

12

The district court denied defendants' motion to dismiss this claim, concluding it should be permitted to proceed "unless it is evident from the complaint, or shown by an answer and subsequent proofs, that military discipline or its command structure is compromised." *Doe*, 98 F. Supp. 3d at 689. We review the district court's determination *de novo*. *Warney v. Monroe Cty.*, 587 F.3d 113, 120 (2d Cir. 2009).

In reviewing the denial of a motion to dismiss, we assume that the allegations in Doe's Amended Complaint are true and draw all reasonable inferences from those allegations in her favor. *Starr Int'l Co. v. Fed. Reserve Bank*, 742 F.3d 37, 40 (2d Cir. 2014). Assuming their truth, Doe's allegations of harassment and abuse are no credit to West Point, an institution founded, as Doe alleges, "to train 'officer-leaders of character to serve the Army and the Nation.'" Joint App'x 13. But this neither does nor should end the judicial inquiry into whether Doe's *Bivens* claim may proceed.

Doe seeks to hold her superior officers personally liable for money damages in connection with their decisions regarding the training, supervision, discipline, education, and command of service personnel at West Point, an officer training school and military base. But Congress, "the constitutionally

13

authorized source of authority over the military system of justice, has not provided a damages remedy" for the constitutional claim that Doe asserts. *Chappell*, 462 U.S. at 304. The Supreme Court, citing the "inescapable demands of military discipline . . . [that] cannot be taught on battlefields," *id.* at 300, has held, unanimously, that absent Congressional authorization, "it would be inappropriate [for courts] to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Id.* at 304; *see also id.* at 305 (holding that "enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations"). We conclude that *Chappell* and its progeny are dispositive of Doe's *Bivens* claim and, accordingly, that the district court erred in determining that Doe's *Bivens* claim may proceed.

## I

We start with *Bivens* itself. In *Bivens*, the Supreme Court permitted the plaintiff, who alleged that he had been subjected to an unlawful, warrantless search of his home and to an unlawful arrest, to proceed with a Fourth Amendment damages claim against allegedly errant federal law enforcement agents, despite the fact that Congress had not provided for such a remedy. 403 U.S. at 389, 395–97. Although the *Bivens* Court permitted this damages claim to

proceed, it signaled, as the Court has repeatedly cautioned since, that "such a remedy will not be available when 'special factors counselling hesitation' are present."[3] *Chappell*, 462 U.S. at 298 (quoting *Bivens*, 403 U.S. at 396). The Court has since made clear that it is "reluctant to extend *Bivens* liability 'to any new context or new category of defendants.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). In the forty-six years since *Bivens* was decided, the Supreme Court has extended the precedent's reach only twice,[4] and it has otherwise consistently declined to broaden *Bivens* to permit new claims.[5] *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (observing

---

[3] The Court has in recent years prescribed a two-step process for determining whether a *Bivens* remedy is available in which we consider, first, whether an alternative remedial scheme exists. *See Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). In *Stanley*, the Court suggested that traditional forms of redress, "designed to halt or prevent" a constitutional violation "rather than [for] the award of money damages," might sometimes be available in the military context. 483 U.S. at 683. We nonetheless assume *arguendo* that there is no alternative remedy here and address our analysis to the Supreme Court's admonition that "even in the absence of an alternative," *Wilkie*, 551 U.S. at 550, courts must pay "particular heed" to "special factors counselling hesitation before authorizing a new kind of federal litigation," *id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)); *see also Stanley*, 483 U.S. at 683 (noting that availability of alternative remedy is "irrelevant" to special factors analysis).

[4] *See Carlson v. Green*, 446 U.S. 14, 18–23 (1980) (finding an implied private cause of action for a prisoner's Eighth Amendment claim); *Davis v. Passman*, 442 U.S. 228, 230–34 (1979) (finding an implied private cause of action for a congressional employee's employment discrimination claim under the Fifth Amendment).

[5] *See Minneci v. Pollard*, 565 U.S. 118, 124–25 (2012) (collecting cases); *see also, e.g.*, *Malesko*, 534 U.S. at 70–73 (no *Bivens* action for prisoner's Eighth Amendment-based suit

that "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," and collecting cases in which the Supreme Court has refused to do so (quoting *Iqbal*, 556 U.S. at 675)).   Indeed, noting that "it is a significant step under separation-of-powers principles for a court to determine that it has the authority," in effect, "to create and enforce a cause of action for [money] damages against federal officials," the Court only recently observed that "it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today."   *Id.* at 1856.

The Supreme Court's separation-of-powers concern with implied causes of action under the Constitution, present in all cases in which plaintiffs have sought to extend *Bivens*'s reach, is particularly acute in the military context.   In *Chappell*, the Supreme Court held that special factors counselled against permitting the plaintiffs — enlisted Navy sailors who alleged that superior officers had discriminated against them on the basis of race — to maintain *Bivens* money damage claims.   462 U.S. at 297, 304.   Referencing the "centuries of experience" reflected in the military's "hierarchical structure of discipline and obedience to

---

against a private corporation that managed a federal prison); *Schweiker v. Chilicky*, 487 U.S. 412, 414, 425–27 (1988) (no *Bivens* action for claim by recipients of Social Security disability benefits that benefits had been denied in violation of the Fifth Amendment); *Bush*, 462 U.S. at 386–90 (no *Bivens* action for claim that federal employer demoted federal employee in violation of the First Amendment).

16

command," a structure "wholly different from civilian patterns," *id.* at 300, the Court concluded that civilian courts, not responsible for the lives of soldiers and "ill-equipped to determine the impact upon discipline" of their intrusions, *id.* at 305 (quoting Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181, 187 (1962)), must "hesitate long" before entertaining suits which ask courts to "tamper with the established relationship between enlisted military personnel and their superior officers," *id.* at 300. Congress, the Court unanimously said, has "plenary control over rights, duties, and responsibilities in the framework of the [m]ilitary [e]stablishment, including regulations, procedures and remedies related to military discipline." *Id.* at 301. In the absence of Congressional action, the Court concluded, "enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations." *Id.* at 305.

The Supreme Court was, if anything, even more emphatic in *Stanley*. The Court ruled there that the plaintiff — a former soldier alleging that the Army had secretly given him doses of LSD to study the drug's effects — could not maintain a *Bivens* action, even though at least some of the defendants in the case were not Stanley's superior military officers (thus not directly implicating *Chappell*'s

17

chain-of-command concerns) and "may well have been civilian personnel." 483 U.S. at 679; *see id.* at 671, 680–84. Citing by way of analogy to its decision in *Feres*, which established that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service," 340 U.S. at 146, the *Stanley* Court explained that there is no "reason why [its] judgment in the *Bivens* context should be any less protective of military concerns than it has been with respect to FTCA suits, where [it] adopted [the] 'incident to service' rule," 483 U.S. at 681. The Court thus concluded — in sweeping language — that in the military context, even where *no* "officer-subordinate relationship exists," the reach of the special factors counselling "abstention in the inferring of *Bivens* actions" is "as extensive as the exception to the FTCA established by *Feres*." *Id.* at 683–84. Accordingly, pursuant to the incident-to-service rule, "no *Bivens* remedy is available for injuries that 'arise out of or are in the course of activity incident to service.'" *Id.* at 684 (quoting *Feres*, 340 U.S. at 146).

## II

This Supreme Court precedent frames our inquiry and leads ineluctably to the conclusion that Doe cannot maintain her *Bivens* claim. Doe was a member of the military at the time the events giving rise to her claim occurred, and the claim concerns superior officers. Further, her claim calls into question "basic choices about the discipline, supervision, and control" of service personnel and would "require[ ] the civilian court to second-guess military decisions," thus triggering the incident-to-service rule.[6] *United States v. Shearer*, 473 U.S. 52, 57–58 (1985) (noting that allegations "go[ing] directly to the 'management' of the military" that "might impair essential military discipline" lie at the "core" of rule's concerns). In such circumstances, her *Bivens* claim must be dismissed.

At the start, by statute, a West Point cadet is a member of the military. "The Regular Army is [a] component of the Army" and "includes . . . cadets of

---

[6] Given that the *Chappell* Court squarely held that "military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations" (although the question presented in that case concerned violations "in the course of military service"), 462 U.S. at 297, 305, and the *Stanley* Court only broadened *Chappell*'s holding, *see* 483 U.S. at 683 (explaining that *Chappell*'s reasoning "extend[s] beyond the situation in which an officer-subordinate relationship exists"), resolution of this case may not require an incident-to-service inquiry at all. Nonetheless, consistent with the approach of our sister circuits, *see Klay v. Panetta*, 758 F.3d 369, 374 (D.C. Cir. 2014); *Cioca v. Rumsfeld*, 720 F.3d 505, 512–14 (4th Cir. 2013), we apply the incident-to-service rule here and reach the same result we would have reached under *Chappell* alone.

the United States Military Academy," 10 U.S.C. § 3075, who swear an oath to "at all times obey the legal orders of [their] superior officers, and the Uniform Code of Military Justice," *id.* § 4346(d). For this reason, in the context of the FTCA, courts citing *Feres* have reliably applied the doctrine of intramilitary immunity to bar suits brought by service academy cadets whenever such suits implicate the incident-to-service rule. *See, e.g.*, *Miller v. United States*, 42 F.3d 297, 301, 308 (5th Cir. 1995); *Collins v. United States*, 642 F.2d 217, 218 (7th Cir. 1981). This Circuit, moreover, has recognized that the rule also applies in the context of suits brought by students who are part of the Reserve Officer Training Corps at *nonmilitary* schools. *See Wake*, 89 F.3d at 55, 58–59, 62.

Next, Doe's alleged injuries clearly are covered by the Supreme Court's holding in *Stanley* that "no *Bivens* remedy is available for injuries that 'arise out of or are in the course of activity incident to service.'" 483 U.S. at 684 (quoting *Feres*, 340 U.S. at 146). As the Supreme Court recognized in *Shearer* when applying the incident-to-service rule, when a claim on its face "requires the civilian court to second-guess military decisions," and when the complaint, fairly read, calls into question "the 'management' of the military" — that is, "basic choices about the discipline, supervision, and control" of service personnel — we

20

are "at the core" of the rule's concerns. 473 U.S. at 57–58. In such circumstances, we do not inquire into "the extent to which particular suits would call into question military discipline and decisionmaking." *Stanley*, 483 U.S. at 682. Instead, such cases "require abstention," *id.* at 683, so as to avoid interference with "the necessarily unique structure of the military establishment" and to defer to the Framers who, "well aware of the differences between [military] and civilian life" and cognizant of the issues that might in future arise, granted "plenary authority to *Congress* . . . '[t]o make Rules for the Government and Regulation of the land and naval Forces,'" *Chappell*, 462 U.S. at 300–01 (emphasis added) (quoting U.S. Const. art. 1, § 8, cl. 14).

Here, in considering whether Doe's injuries occurred "incident to service," we examine the specific factual allegations that underlie her equal protection claim.[7] *See Klay v. Panetta*, 758 F.3d 369, 375 (D.C. Cir. 2014) (noting that the

---

[7] We have suggested that in some circumstances — for instance, where an issue exists for FTCA purposes as to whether a given automobile accident occurred "within a distinctly military sphere of activity," *see Wake*, 89 F.3d at 58 — the incident-to-service inquiry may require the analysis of potentially relevant factors, such as the relationship of the activity at issue to membership in the service or the location of the conduct giving rise to the tort claim. *Id.* No such close analysis is necessary here, however, given the clear relationship between Doe's *Bivens* claim and management and discipline at West Point. In any event, we note that the balance of the relevant factors we identified in *Wake* are clearly present here. Doe was a member of the Army; her tuition-free presence at West Point (and access to the facilities therein) was a benefit conferred as a result of that membership; and her constitutional claim arises from her treatment at

incident-to-service rule bars *Bivens* claims when litigating "the plaintiff's theory of the case" would, in effect, "require military leaders to defend their professional management choices"). The allegations in Doe's Amended Complaint do not merely invite, but require a most wide-ranging inquiry into the commands of Lieutenant General Hagenbeck and Brigadier General Rapp. Specifically, as they relate to these defendants' conduct, Doe's allegations center on the implementation and supervision of allegedly inadequate and harmful training and education programs relating to sexual assault and harassment; on the alleged failure to provide properly both for the report and investigation of sexual assault claims, and for the support of cadets who are assaulted; on the alleged lack of sufficient numbers of female faculty and administrators at West Point and on the failure to recruit female cadets; on the allegedly inadequate punishment meted out not only to perpetrators of sexual violence but also to those who engage in misogynistic chants, slurs and comments; and, most broadly, on the assertedly culpable tolerance of a hostile culture toward women at West Point. Adjudicating such a money damages claim would require a

West Point, where she resided and was training to become an officer. *See id*. at 57 (identifying "status as a member of the military," "the location of the conduct giving rise to the underlying tort claim," and "whether the service member was taking advantage of a privilege or enjoying a benefit conferred as a result of military service" as among relevant factors).

22

civilian court to engage in searching fact-finding about Lieutenant General Hagenbeck and Brigadier General Rapp's "basic choices about the discipline, supervision, and control" of the cadets that they were responsible for training as future officers. *Shearer*, 473 U.S. at 58. In such circumstances, we conclude that *Chappell* and *Stanley* squarely foreclose Doe's *Bivens* claim.

This conclusion, we note, is consistent with the recent decisions of at least two other circuits. The D.C. Circuit rejected as "patently deficient" a *Bivens* claim pressed by current and former sailors and Marines who alleged they were the victims of sexual assault or harassment resulting from a military culture attributable to their superiors: "If adjudicating the case would require military leaders to defend their professional management choices — 'to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions' — then the claim is barred by the 'incident to service' test." *Klay*, 758 F.3d at 370, 375 (citation omitted) (quoting *Shearer*, 473 U.S. at 58). The Fourth Circuit, addressing a similar claim, was equally clear: "*Bivens* suits are never permitted for constitutional violations arising from military service, no matter how severe the injury or how egregious the rights infringement." *Cioca v. Rumsfeld*, 720 F.3d 505, 512 (4th Cir. 2013) (quoting Erwin Chemerinsky, Federal

23

Jurisdiction 621–22 (5th ed. 2007)). This result, the Fourth Circuit said, implies no tolerance for the misconduct alleged in a plaintiff's pleading, but rather reflects "the judicial deference to Congress and the Executive Branch in matters of military oversight required by the Constitution and our fidelity to the Supreme Court's consistent refusal to create new implied causes of action in this context." *Id.* at 518; *see also id.* at 514 (noting that "the *Chappell*, *Stanley*, *Feres* and *Shearer* precedents mandate that courts not permit a *Bivens* action that challenges military decisionmaking").

Doe argues, relying principally on *United States v. Virginia* (*VMI*), 518 U.S. 515 (1996), that the failure to afford her a *Bivens* claim against Lieutenant General Hagenbeck and Brigadier General Rapp "contradict[s] *VMI*," Doe's Br. at 15, specifically the Supreme Court's merits determination therein that the State of Virginia could not preclude women from attending the Virginia Military Institute, a public college that styles itself as providing a military education.[8] *VMI*, 518 U.S. at 519. But this argument misses the point. Lieutenant General

_____

[8] The Institute is not affiliated with the U.S. armed forces, nor are its students, by virtue of their enrollment there, members of the United States military. *Cf. id.* at 520–22 (describing the Institute as a state military college both financially supported by, and subject to control by, the Virginia General Assembly, and noting that it differs from federal service academies because it prepares students for both military and civilian life).

Hagenbeck and Brigadier General Rapp do not seek dismissal based on the scope of equal protection guarantees — a subject to which *VMI* could be pertinent. Instead, they invoke binding Supreme Court precedent standing for the proposition that whatever the scope of the particular constitutional *rights* at issue, the *remedy* of money damages is unavailable to members of the armed services for violations of those rights where Congress has not acted and the incident-to-service rule is satisfied.

*Chappell* itself involved an equal protection claim by African American enlisted personnel who alleged that their superior officers "failed to assign them desirable duties, threatened them, gave them low performance evaluations, and imposed penalties of unusual severity," all on account of their race. 462 U.S. at 297; *see Wallace v. Chappell*, 661 F.2d 729, 730 (9th Cir. 1981). Despite the gravity of these allegations, and with no disparagement of the right at stake, the Court, noting that Congress "has established a comprehensive internal system of justice to regulate military life" and "has not provided a damages remedy for claims by military personnel that constitutional rights have been violated by superior officers," determined that a *Bivens* remedy was unavailable. *Id*. at 302–04. As the Court unanimously recognized, "[j]udges are not given the task of running

25

the Army. The responsibility for setting up channels through which . . . grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates." *Id.* at 301 (second alteration in original) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953)). *VMI* is simply not germane to the remedial inquiry mandated by *Chappell*, *Stanley*, and other *Bivens* cases.

Doe next contends, and the dissent agrees, that pursuant to this Court's decision in *Taber v. Maine*, 67 F.3d 1029 (2d Cir. 1995), her injuries did not arise incident to military service. This is also incorrect. *Taber* involved an FTCA claim brought by an off-duty Navy Seabee who was injured in an automobile accident by another off-duty Navy serviceman. *Id.* at 1032. This Court concluded in *Taber* that the question whether *Feres* barred the plaintiff's FTCA claim turned, *in the circumstances of that case*, on whether a person in Taber's position would be entitled to workers' compensation benefits on the theory that when injured he was engaged in activities that "fell within the scope of [his] military employment." *Id.* at 1050. Whatever *Taber*'s significance to this Circuit's FTCA case law, the *Taber* panel had no occasion to address either *Chappell* or *Stanley*, or the scope of "abstention in the inferring of *Bivens* actions"

more generally.[9] *Stanley*, 483 U.S. at 683. Moreover, even in the FTCA context, *Taber* itself noted, citing Supreme Court precedent, that the incident-to-service rule (regardless of workers' compensation considerations) is properly invoked when adjudicating the claim of a service member would require "'commanding officers . . . to stand prepared to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions.'" 67 F.3d at 1049 (quoting *Shearer*, 473 U.S. at 58). This is precisely the problem with Doe's claim here.

Doe attempts to avoid this conclusion by arguing that her damages claim "does not interfere with military discipline or management . . . because she only questions *school* management" — the decisions of Lieutenant General Hagenbeck and Brigadier General Rapp "made in their roles as school administrators — not

---

[9] As a matter of this Circuit's FTCA precedent, moreover, it is noteworthy that only some nine months after the amended decision in *Taber*, this Court in *Wake* suggested that to the extent the appellant there argued that *Taber* had created a new "scope of employment" test for determining the applicability of the *Feres* doctrine, *Taber* could not be read to alter the reach of *Feres*, which was then and remains binding precedent. 89 F.3d at 61. This Circuit has not relied on *Taber*'s holding in the intervening twenty-plus years, and at least one other circuit has declined to employ its approach. *See Skees v. United States*, 107 F.3d 421, 425 n.3 (6th Cir. 1997) (declining to adopt *Taber*). In such circumstances, *Taber* is a thin reed, indeed, to support the dissent's position that we may properly entertain a *Bivens* claim here, despite the broad inquiry that Doe's allegations demand into the discipline, supervision, and control of cadets at West Point, on the theory that Doe, when allegedly assaulted while out after hours, was not "'engaged in activities that fell within the scope of [her] military employment,'" Dissenting Op. at 21 (citing *Taber*, 67 F.3d at 1050).

as military officials." Doe's Br. at 36. The dissent, too, takes this tack.[10] Observing, dismissively, that West Point serves a military purpose "*to some extent*," Dissenting Op. at 23 (emphasis added), the dissent claims that the "incident to service" rule does not apply because at the time that Doe was allegedly assaulted, she was "out for an evening walk on a college campus," *id.* at 22, and because, more broadly, Doe while at West Point was not a soldier on the battlefield, but a student attending college. *Id.* at 22–23. "West Point functions principally as a school," the dissent urges, and "Doe was primarily a student." *Id.* at 24.

With respect, this analysis is both contrary to the case law and unsupported by the factual allegations in Doe's Amended Complaint. As Doe

---

[10] The dissent in addition urges that defendants allegedly violated military regulations in connection with Doe's tenure at West Point and that "[j]udicial review of . . . allegations that the individual defendants failed to follow mandatory military . . . regulations would not unduly interfere" with the military's proper operation. Dissenting Op. at 27. Suffice it to say that the dissent cites no case law supporting the proposition that the availability of a *Bivens* damages suit turns on this contingency, and unsurprisingly, since such an approach would be inconsistent with courts' traditional reluctance "to intrude upon the authority of the Executive in military and national security affairs' unless 'Congress specifically has provided otherwise.'" *Ziglar*, 137 S. Ct. at 1861 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)); *see also id.* at 1858 (citing *Chappell* and *Stanley* in suggesting that Congress's exercise of regulatory authority "in a guarded way" constitutes a special factor counselling against recognition of a *Bivens* claim on the ground that it is "less likely that Congress would want the Judiciary to interfere").

28

has acknowledged, the United States Military Academy at West Point has a single, unitary mission: to "train 'officer-leaders of character to serve the Army and the Nation.'" Joint App'x 13. Its cadets swear an oath to "*at all times* obey the legal orders of . . . superior officers, and the Uniform Code of Military Justice," 10 U.S.C. § 4346(d) (emphasis added), and are subject to military discipline pursuant to the Code, *id.* § 802(a)(2). Cadets are divided into companies, each commanded by an Army officer, "for the purpose of military instruction," *id.* § 4349(a), and are "trained in the duties of members of the Army," *id.* § 4349(e), and even paid as members of the Army, 37 U.S.C. § 203(c). Doe's contention that this Court might disaggregate those aspects of cadets' lives that concern "education" from those involving their training to be future officers — a contention entirely unsupported by allegations in the Amended Complaint — is thus fanciful, at best, because academic and military pursuits are inextricably intertwined at the United States Military Academy, which exists for "the instruction and preparation for military service" of Army members.[11] 10 U.S.C. § 4331(a).

---

[11] Moreover, even assuming such disaggregation could be done, it is directly contrary to *Stanley*'s admonition against inquiring whether "particular suits," examined case by case, "would call into question military discipline and decisionmaking." 483 U.S. at 682–83. Such inquiries, the *Stanley* Court concluded, "raising the prospect of

As *Chappell* recognized, "[t]he inescapable demands of military discipline and obedience to orders cannot be taught on battlefields," and "conduct in combat inevitably reflects the training that precedes combat." 462 U.S. at 300. Doe was not "a soldier on a battlefield" at the time of the events challenged here, as the dissent points out. Dissenting Op. at 23. This observation, however, is beside the point. As a member of the Army, Doe was training at West Point to lead battlefield soldiers. Adjudicating the claim she brings against her superior officers, moreover, which charges them with "creat[ing] a dangerous and sexually hostile environment," Joint App'x 28, and challenges matters ranging from the alleged "underrepresentation of women in the school administration" and among the cadet classes, *id.* at 14, to the alleged tolerance of "sexually aggressive language and conduct by faculty, officials and male cadets," *id.* at 28, would require a civilian court to examine a host of military decisions regarding aspects of West Point's culture, as well as the supervision of West Point cadets, their training and education, and their discipline by superior officers. Doe's claim thus "strikes at the core" of the concerns implicated by the incident-to-service rule: that civilian courts are ill-equipped "to second-guess

compelled depositions and trial testimony by military officers concerning the details of their military commands," would themselves "disrupt the military regime." *Id*.

30

military decisions" regarding "basic choices about the discipline, supervision, and control" of service members, *Shearer*, 473 U.S. at 57–58, that doing so could impair "military discipline and effectiveness" in unintended and unforeseen ways, *id.* at 59, and that the "explicit constitutional authorization for *Congress* '[t]o make Rules for the Government and Regulation of the land and naval Forces,'" counsels hesitation as to the wisdom of money damages litigation, where Congress has not authorized it, *Stanley*, 483 U.S. at 681–82 (quoting U.S. Const. art. I, § 8, cl. 14).

In sum, West Point is part of the Department of the Army. Its cadets are service members. Lieutenant General Hagenbeck was the commanding officer of a military base during his time at West Point, and Brigadier General Rapp commanded the cadets. The future officers who study and train at West Point, like the enlisted men and women they are trained to command, may not invoke *Bivens* to recover damages for injuries that "arise out of or are in the course of activity incident to service." *Stanley*, 483 U.S. at 684. Doe's *Bivens* claim against her superior officers, implicating Army training, supervision, discipline, education, and command, triggers the incident-to-service rule and cannot proceed.

## CONCLUSION

We note, as did the D.C. Circuit, that Congress "has been 'no idle bystander to th[e] debate' about sexual assault in the military." *Klay*, 758 F.3d at 376 (alteration in original) (quoting *Lebron v. Rumsfeld*, 670 F.3d 540, 551 (4th Cir. 2012)). In reversing the district court's determination as to the viability of Doe's *Bivens* claim, we do not discount the seriousness of her allegations, nor their potential significance to West Point's administration. As the Supreme Court has made clear, however, it is for Congress to determine whether affording a money damages remedy is appropriate for a claim of the sort that Doe asserts. We therefore join the D.C. Circuit and the Fourth Circuit in concluding that no *Bivens* remedy is available here. We accordingly need not reach the question whether Lieutenant General Hagenbeck and Brigadier General Rapp are entitled to qualified immunity.

For the foregoing reasons, we **REVERSE** the order of the district court, and **REMAND** to the district court with instructions to dismiss Doe's equal protection claim.

DENNY CHIN, *Circuit Judge:*

I respectfully dissent.

Assuming, as we must at this juncture of the case, that the allegations of the amended complaint are true, plaintiff-appellee Jane Doe was subjected to pervasive and serious sexual harassment, including rape, at the United States Military Academy at West Point ("West Point"). The harassment resulted from practices and policies that the individual defendants permitted to proliferate and, indeed, implemented or encouraged, depriving Doe of an equal education because of her gender. The amended complaint alleges that the individual defendants created, promoted, and tolerated a misogynistic culture, including by, for example, setting separate curriculum requirements for women and men (self-defense for first-year female cadets and boxing for first-year male cadets), requiring sexually transmitted disease testing for female but not male cadets, warning female cadets that it was their burden to spurn sexual advances from male cadets while openly speaking to male cadets about sexual exploits and encouraging them to take advantage of any opportunity to have sex, imposing inadequate punishment for offenders, and permitting sexually explicit, violent,

and degrading group chants during team building exercises, with verses such as the following:

> I wish that all the ladies / were bricks in a pile / and I was a mason/ I'd lay them all in style. . . .
>
> I wish that all the ladies / were holes in the road / and I was a dump truck / I'd fill 'em with my load. . . .
>
> I wish that all the ladies / were statues of Venus / and I was a sculptor / I'd break 'em with my penis.

App'x 15.

If West Point were a private college receiving federal funding or another public educational institution and allegations such as these were proven, there clearly would be a violation of Doe's rights and she could seek recourse for her injuries. The Government argues, however, that the individual defendants are immune from suit because they are military officers. And while it acknowledges that "[s]exual assault in the military and at service academies cannot be tolerated," it argues that Doe is a service member and that "service members may not sue their superiors for injuries that arise incident to military service," Appellants' Br. at 2, relying on the concept of intramilitary immunity as set forth in *Feres v. United States*, 340 U.S. 135 (1950), and its progeny. The majority accepts the argument.

2

I do not agree that the *Feres* doctrine applies, for in my view Doe's injuries did not arise "incident to military service." When she was subjected to a pattern of discrimination, and when she was raped, she was not in military combat or acting as a soldier or performing military service. Rather, she was simply a student, and her injuries were incident only to her status as a student. When she was raped, she was taking a walk on a college campus with another student, someone she thought was a friend. The actions and decisions she now challenges had nothing to do with military discipline and command; instead, she seeks recourse for injuries caused by purported failures on the part of school administrators acting in an academic capacity overseeing a learning environment for students.

While West Point is indeed a military facility, it is quintessentially an educational institution. As its website proclaims, it is "one of the nation's top-ranked colleges," and it provides its "students with a top-notch education."[1] In my view, the *Feres* doctrine does not bar Doe's equal protection claims. For these

---

[1]     Letter from Col. Deborah J. McDonald, West Point Director of Admissions, to High School Seniors, http://www.usma.edu/admissions/Shared%20Documents/COL-web-letter.pdf; *see also* United States Military Academy, http://www.westpoint.edu/ (last visited Aug. 29, 2017) ("The Academy provides a superb four-year education, which focuses on the leader development of cadets in the academic, military, and physical domains, all underwritten by adherence to a code of honor.").

and other reasons discussed below, I would affirm the district court's decision denying the individual defendants' motion to dismiss the equal protection claim. Accordingly, I dissent.

## I.

As alleged in the amended complaint, the facts are summarized as follows:

Doe is a former cadet who resigned from West Point in 2010 after completing two years. She grew up in a military family and graduated near the top of her class in high school. At West Point she "thrived academically, participated in extracurricular activities, and ranked high in her class." App'x 14. Because she left West Point before the start of her third year, she never assumed active status and had no obligation to enlist as a soldier. *See* 32 C.F.R. § 217.6(f)(6)(ii)(A).[2] Her obligations to the military did not vest, and she was not contractually required to repay the cost of her education.

---

[2] "Fourth and Third Classmen (First and Second Years). A fourth or third classman disenrolled will retain their MSO [Military Service obligation] in accordance with 10 U.S.C. chapter 47 and DoD Instruction 1304.25 *but have no active duty service obligation* (ADSO)." 32 C.F.R. § 217.6(f)(6)(ii)(A) (emphasis added). *See also* 32 C.F.R. § 217.4(d) ("Cadets and midshipmen disenrolling or those disenrolled *after the beginning of the third academic year* from a Service academy normally will be called to active duty in enlisted status, if fit for service.") (emphasis added).

West Point has an enrollment of approximately 4,600 cadets and a faculty of some 600 individuals, of whom three-quarters are military personnel and one-quarter are civilian employees.  Cadets live on-campus in dormitories all four years and eat in dining halls.  The curriculum "is designed to train 'officer-leaders of character to serve the Army and the Nation,'" App'x 3, and thirty-six majors are offered, including Politics, Art, Philosophy and Literature, Engineering, History, Physics and Sociology.[3]  West Point is accredited by the Middle States Commission on Higher Education, the accreditation unit for the Middle States Association of Colleges and Schools.[4]  Cadets may participate in numerous extracurricular activities, including athletics, honor societies, academic competitions, and musical groups.  West Point fields athletic teams in twenty-four NCAA Division I sports and twenty-one club sports.  Upon graduation, West Point cadets earn a Bachelor of Science degree and become commissioned as second lieutenants in the U.S. Army.

---

[3]  West Point Curriculum, http://www.usma.edu/curriculum/SitePages/ Home.aspx.

[4]  The Middle States Commission on Higher Education conducts accreditation activities for institutions of higher education in states in the mid-Atlantic region, including New York.  Middle States Commission on Higher Education, http://www.msche.org/ (last visited Aug. 29, 2017).  West Point is one of many institutions accredited by the organization.  *See* Institution Directory, Middle States Commission on Higher Education, http://www.msche.org/institutions_directory.asp (last visited Aug. 29, 2017).

Approximately 200 of the 1,300 cadets in Doe's entering class were women. Doe was often the only woman in a squad of approximately ten cadets. During her time at West Point, she was subjected to pervasive sexual harassment and a culture of sexual violence. Her classmates regularly made misogynistic and sexually aggressive comments, which were frequently ignored and sometimes condoned by West Point administrators. During team-building exercises, cadets would march and sing "sexual, misogynistic chants," such as the one quoted above, in view and earshot of faculty and administrators. App'x 16. Male cadets often used derogatory terms to describe women and frequently made contemptuous comments about the physical appearance of women. West Point officials ignored or endorsed these comments, and openly joked with male cadets about sexual exploits. Male faculty members routinely expressed sympathy with male cadets over the lack of opportunities to have sex, and suggested that they seize any chance they could to do so.

There were other disparities in the treatment of male and female cadets. West Point officials required mandatory annual sexually transmitted disease ("STD") testing for female cadets, but not male cadets, explaining that STDs were more harmful to women than to men and therefore it was the

6

responsibility of women to prevent the spread of these diseases. In the Physical Education program in the first year at West Point, male cadets were required to take boxing while female cadets were required to take self-defense.

While West Point provided training for the prevention of sexual assault and harassment, the training was inadequate. West Point officials provided only limited training on the concepts of respect and consent, while sending the message to female cadets that it was "a woman's responsibility" to prevent sexual assault and that "it was their job to say 'no,' when faced with inevitable advances from their male colleagues." App'x 18. West Point officials failed to punish cadets who perpetrated sexual assaults and created an environment in which male cadets understood that they could sexually assault female colleagues with "near impunity," while female cadets understood "that they risked their own reputations and military careers" by reporting sexual assaults against them. App'x 18. The vast majority of faculty members and administrators were male.

A 2010 Department of Defense ("DoD") survey found that fifty-one percent of female cadets and nine percent of male cadets reported that they had

7

experienced sexual harassment at West Point.[5]  The survey found that more than nine percent of the female cadets at West Point experienced unwanted sexual contact in 2010, and some eighty-six percent of these women did not report the incident.[6]  Of the female cadets who did not report unwanted sexual contact, seventy-one percent feared "people gossiping about them" and seventy percent "felt uncomfortable" making a report.[7]  In 2011, DoD found that West Point was only "partially in compliance" with sexual harassment and assault policies, and that West Point's prevention training was "deficient," did not meet the minimum standard of annual training for cadets, lacked an institutionalized comprehensive sexual assault prevention and response curriculum, and failed to comply with DoD directives intended to reduce rape and sexual assault.[8]

---

[5]     *See* Paul J. Cook & Rachel N. Lipari, Defense Manpower Data Center, *2010 Service Academy Gender Relations Survey*, at iv-v (2010), http://www.sapr.mil/public/docs/research/FINAL_SAGR_2010_Overview_Report.pdf.

[6]     *Id.* at iv-v.

[7]     *Id.* at v.  Underreporting of sexual violence on college campuses is a significant issue.  *See* Laura L. Dunn, *Addressing Sexual Violence in Higher Education: Ensuring Compliance with the Clery Act, Title IX and VAWA*, 15 Geo. J. Gender & L. 563, 566 (2014).

[8]     The statistics at West Point are representative of a large-scale epidemic of sexual assault and harassment of women on college campuses around the country.  A 2006 study concluded that "[o]ne in five women is sexually assaulted while in college."  *See* White House Task Force To Protect Students from Sexual Assault, *Not Alone: The First Report of the White House Task Force to Protect Students from Sexual Assault* 6 (2014), https://www.justice.gov/ovw/page/file/905942/download.  A 2015 survey of 27 U.S.

Defendants-appellants Lieutenant General Franklin Lee Hagenbeck, the Superintendent of West Point from July 2006 to July 2010, and Brigadier General William E. Rapp, Commander of Cadets at West Point from 2009 to 2011, were responsible for administering the sexual assault prevention and response program and the training of cadets on campus during the relevant time period. According to the amended complaint, however, instead of implementing programs and policies to educate and protect students, defendants created, promulgated, implemented, and administered the policies, practices, and customs at issue. The 2009-2010 DoD Annual Report on Sexual Harassment and Violence at Military Service Academies found that trends of unwanted sexual contact experienced by female cadets increased during the time Hagenbeck and Rapp were, respectively, Superintendent and Commander of Cadets.

On May 8, 2010, around 1 a.m., a male cadet stopped by Doe's dormitory room and invited her for a walk. It was after curfew, and Doe had earlier taken a sedative prescribed to help her sleep because she had been

___

universities by the Association of American Universities found that approximately one-third of female undergraduates reported experiencing non-consensual sexual contact at least once. David Cantor et al., Westat, *Report on the Association of American Universities Campus Climate Survey on Sexual Assault and Sexual Misconduct,* at xi (2015), http://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/ Sexual_Assault_Campus_Survey/AAU_Campus_Climate_Survey_12_14_15.pdf.

suffering from anxiety and stress.  Nonetheless, she agreed to go with him.  They eventually walked into an administrative building and the male cadet began drinking alcohol, offering Doe a few sips.  She took them, and then lost consciousness as the alcohol mixed with her medication.  The male cadet then took advantage, attacking Doe and having "forcible, non-consensual intercourse with her," on the concrete floor of a boiler room.  App'x 22.  She woke up in her own bed a few hours later, with dirt on her clothes and hair, bruises on her lower back, and blood between her legs.  Three days later, when she went for a vaginal examination at West Point's health clinic, there were signs of vaginal tearing.  She eventually left West Point, enrolling at a four-year college from which she earned a degree.

Doe brought this action below against the United States under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, and the Little Tucker Act, 28 U.S.C. § 1346(a)(2), as well as against Hagenbeck and Rapp in their individual capacities under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for due process and equal protection violations.  The district court dismissed the claims against the United States as well as the due process claim, and permitted Doe to pursue only her equal

protection claim against the individual defendants.  The district court held that the *Feres* doctrine did not bar the equal protection claim and that the individual defendants were not entitled to qualified immunity.  Only the district court's denial of defendants' motion to dismiss the equal protection claim is before us on this interlocutory appeal.[9]

## II.

### A.  **Equal Protection**

Since 1971, the Supreme Court "has repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law or official policy denies to women, simply because they are women, full citizenship stature -- equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *United States v. Virginia*, 518 U.S. 515, 532 (1996) ("*VMI*") (citing, *inter alia*, *Reed v. Reed*, 404 U.S. 71 (1971)).  In *VMI*, the Court held that Virginia's policy of excluding women from enrolling in its historically single-sex military college violated the Equal Protection Clause of the Fourteenth Amendment.  518 U.S. at

---

[9]    Because the majority holds that Doe's equal protection claims are barred by the *Feres* doctrine, it does not reach the Government's alternative argument that the individual defendants are entitled to qualified immunity.  Accordingly, I do not discuss the qualified immunity issue, but simply note that I believe the district court correctly rejected the defense at the motion-to-dismiss stage.

11

534. Similarly, in *Mississippi University for Women v. Hogan*, 458 U.S. 718, 733 (1982), the Court held that a state university's policy of admitting only women to its nursing programs violated the Equal Protection Clause.

These principles apply not just to gender discrimination in admissions to educational institutions but to the continued treatment of students after they have been admitted. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (holding plaintiffs could pursue claims against school system and superintendent for "unconstitutional gender discrimination in schools" under § 1983, where defendants purportedly failed to address sexually harassing conduct by another student). Courts have thus recognized equal protection claims where gender discrimination created a hostile educational environment. *See, e.g.*, *Hayut v. State Univ. of New York*, 352 F.3d 733, 743-46 (2d Cir. 2003) (allowing § 1983 equal protection claim by student against professor for hostile educational environment created by "derogatory and sexually-charged comments"). Moreover, the Supreme Court has recognized a *Bivens* claim for gender discrimination, holding that the Equal Protection Clause of the Fifth Amendment confers "a federal constitutional right to be free from gender discrimination." *Davis v. Passman*, 442 U.S. 228, 235 (1979) (holding that former

12

congressional staff member could sue U.S. Congressman for damages under Fifth Amendment for discriminating against her on basis of sex).

Equal protection and other constitutional principles have been applied to the military and military institutions. In *Frontiero v. Richardson*, the Court held that a statutory scheme for housing allowances and spousal medical and dental benefits that applied different standards for male and female active service members was "constitutionally invalid." 411 U.S. 677, 688 (1973). *See also Fitzgerald*, 555 U.S. at 257 (observing that students at "military service schools and traditionally single-sex public colleges," which are exempt from Title IX of Educational Amendments of 1972, 20 U.S.C. § 1681(a), could bring § 1983 claims for violation of equal protection clause); *VMI*, 518 U.S. at 535-36, 547-54; *Schlesinger v. Ballard*, 419 U.S. 498 (1975) (rejecting, but reaching merits, of claim challenging different discharge policies for male and female officers, based on then-existing exclusion of women from combat roles). In *Crawford v. Cushman*, we observed that "a succession of cases in this circuit and others had reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications." 531 F.2d 1114, 1120 (2d Cir. 1976); *see also Dibble v.*

*Fenimore*, 339 F.3d 120, 128 (2d Cir. 2003) ("We decline to adopt a categorical rule on the justiciability of intramilitary suits.").

The military has itself adopted regulations to address the issue of gender discrimination and sexual harassment. Army regulations unambiguously prohibit sexual harassment, and commanders and supervisors are obliged to ensure that sexual harassment is not tolerated.[10] All military academies (including West Point) must comply with regulations promulgated by DoD as part of its Sexual Assault Prevention and Response Program.[11]

Hence, Doe was entitled, under the Fifth Amendment and the Army's own regulations, to an environment free from gender discrimination and sexual harassment.

---

[10] *See, e.g.*, U.S. Army Reg. 600-20, Ch. 7-3(a) (Mar. 18, 2008) ("The policy of the Army is that sexual harassment is unacceptable conduct and will not be tolerated."); *id.* Ch. 7-3(b) ("The POSH [Prevention of Sexual Harassment] is the responsibility of every Soldier. . . . Leaders set the standard for Soldiers . . . to follow."); *id.* Ch. 7-2(a) ("Commanders and supervisors will . . . [e]nsure that assigned personnel . . . are familiar with the Army policy on sexual harassment."); *id.* Ch. 7-2(d) ("Commanders and supervisors will . . . [s]et the standard."); *id.* Ch. 7-4(a) (defining "sexual harassment" to include physical or verbal conduct); *id.* Ch. 7-6(b) ("A hostile environment occurs when Soldiers or civilians are subjected to offensive, unwanted and unsolicited comments, or behaviors of a sexual nature [including] for example, the use of derogatory gender-biased terms, comments about body parts, suggestive pictures, explicit jokes, and unwanted touching."). Army regulations expressly acknowledge that "[s]exual harassment is a form of gender discrimination." *Id.* Ch. 7-4.

[11] *See* 32 C.F.R. § 103.5; U.S. Dep't of Def. Dir. 6495.01 (Jan. 23, 2012), https://www.hsdl.org/?abstract&did=761622.

## B. The *Feres* Doctrine

In 1950, the Supreme Court held in *Feres v. United States* that "the Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146. *Feres* involved three cases, brought by or on behalf of servicemen against the United States for personal injuries, sustained "while on active duty and not on furlough," purportedly caused by the "negligence of others in the armed forces." *Id.* at 137-38. In two of the cases, death resulted. *Id.* at 137. The Court held that Congress did not intend to subject the Government to tort claims "by a member of the armed services." *Chappell v. Wallace*, 462 U.S. 296, 299 (1963) (interpreting *Feres*).

The Court later extended the concept of intramilitary immunity to *Bivens* claims. A *Bivens* remedy is not available when "special factors counseling hesitation" are present. *Bivens*, 403 U.S. at 396; *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) ("The Court's precedents now make clear that a *Bivens* remedy will not be available if there are 'special factors counseling hesitation in the absence of affirmative action by Congress.'" (citation omitted)). In *Chappell*, the Court recognized that "the unique disciplinary structure of the military establishment

15

and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Chappell*, 462 U.S. at 304; *see also United States v. Stanley*, 483 U.S. 669, 683-84 (1987) (recognizing that rationales for intramilitary immunity as explained in *Feres* are "special factors" counseling against *Bivens* relief, and "holding that no *Bivens* remedy is available for injuries that 'arise out of or are in the course of activity incident to service'") (quoting *Feres*, 340 U.S. at 146).

At the same time, however, "our citizens in uniform may not be stripped of basic civil rights simply because they have doffed their civilian clothes." Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181, 188 (1962) (quoted in *Chappell*, 462 U.S. at 304). As the Court noted in *Chappell*: "This Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." 462 U.S. at 304-05. Indeed, members of the military have been permitted, after *Feres*, to bring constitutional challenges against the Government with respect to matters relating to the military. *See Frontiero*, 411 U.S. at 688; *accord Regan v. Starcraft Marine, LLC*, 524 F.3d 627, 640-41 (5th Cir.

16

2008) (*Feres* did not bar suit brought by service member "engaged in purely recreational activity" "not related to any tactical or field training," even where recreational facility was provided "to improve the morale and welfare" of service members); *Crawford*, 531 F.2d at 1125-27 (holding, where servicewoman was discharged from Marines because she was pregnant, that her rights to equal protection and due process were violated, and ordering award of damages). *See also Schlesinger*, 419 U.S. at 508-10; *Parker v. Levy*, 417 U.S. 733, 758-60 (1974) (rejecting, but reaching merits of, First Amendment challenge brought by Army captain convicted by general court-martial of violations of Uniform Code of Military Justice, and observing that "the members of the military are not excluded from the protection granted by the First Amendment").

In cases decided after *Feres*, the Court has explained the "broad rationales" underlying its determination that soldiers may not maintain tort suits against the Government or members of the military for injuries arising incident to military service. *United States v. Johnson*, 481 U.S. 681, 688 (1987). First, there is a "unique relationship between the Government and military personnel," *Chappell*, 462 U.S. at 299, that is "'distinctively federal in character.'" *Johnson*, 481 U.S. at 689 (quoting *Feres*, 340 U.S. at 143). The military function is performed "in

17

diverse parts of the country and the world," and when a service member is injured "incident to service -- that is, because of his military relationship with the Government" -- a uniform federal remedy should be available, and "the fortuity of the situs of the alleged negligence" should not dictate whether the Government is liable. *Id*.

Second, Congress has established alternative, statutory means of compensation for military personnel injured incident to service. As the Court observed in *Johnson*, "the existence of these generous statutory disability and death benefits is an independent reason why the *Feres* doctrine bars suit for service-related injuries." *Id*. It is not likely, the Court has concluded, that Congress would have created "'systems of simple, certain, and uniform compensation for injuries or death of those in the armed services'" while intending at the same time to permit lawsuits for service-related injuries under the FTCA. *Chappell*, 462 U.S. at 299 (quoting *Feres*, 340 U.S. at 144).[12]

---

[12]     In subsequent cases, the courts have recognized that "the presence of a compensation system, persuasive in *Feres*, does not of necessity preclude a suit for negligence." *United States v. Muniz*, 374 U.S. 150, 160 (1963) (citing *United States v. Brown*, 348 U.S. 110 (1954)); *see also Taber v. Maine*, 67 F.3d 1029, 1039 (2d Cir. 1995) ("Indeed, the Supreme Court and several circuit courts (without reproof from the Supreme Court) have subsequently . . . allowed FTCA claims in a significant number of cases in which the injured plaintiffs were fully covered by the government's compensation scheme.").

Third, suits based upon service-related activity "'would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" *Johnson*, 481 U.S. at 691 (quoting *Shearer*, 473 U.S. at 57). Courts should not intrude in military matters, the Court has explained, because "a suit based upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission." *Johnson*, 481 U.S. at 691; *see United States v. Shearer*, 473 U.S. 52, 59 (1985) ("*Feres* seems best explained by the peculiar and special relationship of the soldier to his superiors, the effect of the maintenance of such suits on discipline, and the extreme results that might obtain if suits . . . were allowed for negligent orders given or negligent acts committed in the course of military duty.") (internal quotation marks omitted).

In *Taber v. Maine*, after reviewing the Supreme Court case law, we summarized the various considerations and held that:

> an appropriate test for applying the *Feres* doctrine must respect: (1) the Supreme Court's stated concern for keeping courts away from delicate questions involving military discipline; (2) *Feres*'s clear intention to replace the contingencies of local tort law with a uniform federal scheme; and (3) *Feres*'s original desire that this uniformity is to be achieved through exclusive recourse

19

> to the federal system of military death and disability
> benefits.

67 F.3d 1029, 1049 (2d Cir. 1995).

In *Taber*, the plaintiff Taber was a Navy "Seabee" -- a construction worker -- who was injured in Guam when his car was struck by a car driven by another Navy serviceman, Maine. *Id.* Both were on active duty but on liberty, and the accident occurred on a public road. *Id.* Taber had spent the day with his companion and they were driving back to her home for the weekend when the accident occurred. *Id.* He sued the United States and Maine for his injuries, which he alleged were caused by Maine's negligent driving. *Id.* The Government defended in part by relying on the *Feres* doctrine, and the district court agreed, dismissing the claims. *Id.* at 1033.

On appeal, the Second Circuit reversed, holding that "the link between Taber's activity when he was injured and his military status is too frail to support a *Feres* bar." *Id.* at 1050. The Court explained that "[t]here is nothing characteristically military about an employee who, after working-hours are done, goes off to spend a romantic weekend with a companion. . . . The accident that followed, on the open road and on the way to [the companion]'s house[,] had 'nothing to do with' Taber's military career and was 'not caused by service except

20

in the sense that all human events depend upon what has already transpired.'"

*Id.* at 1051 (quoting *Brooks v. United States*, 337 U.S. 49, 52, 69 (1949)).

*Taber* teaches us that military status does not automatically trigger *Feres* immunity. Rather, we apply the incident to service test by asking whether, at the time the plaintiff was injured, she was "engaged in activities that fell within the scope of [her] military employment." 67 F.3d at 1050. In *Wake v. United States*, we reiterated that we must look at "the totality of the germane facts," and noted that "[i]n examining whether a service member's injuries were incurred 'incident to service,' the courts consider various factors, with no single factor being dispositive." 89 F.3d at 57-58. In addition to "[t]he individual's status as a member of the military at the time of the incident," those factors include: "the relationship of the activity to the individual's membership in the service"; "the location of the conduct giving rise to the underlying tort claim"; "whether the activity is limited to military personnel and whether the service member was taking advantage of a privilege or enjoying a benefit conferred as a result of military service." *Id.* at 58.[13]

---

[13]    In *Wake*, we applied *Feres* to bar claims brought by a student in the Reserve Officers Training Corps at a nonmilitary college. 89 F.3d at 55. The student was an enlisted inactive member of the Navy Reserves who was assigned to "temporary duty" to travel to a military clinic for a physical examination required to qualify as a

21

## C.    Application of the *Feres* Doctrine to this Case

In my view, the *Feres* doctrine does not bar Doe's *Bivens* claim that she was denied her constitutional right to equal access to education, for her injuries did not arise "incident to service."  First, as to the activities immediately preceding Doe's rape, her ultimate injury, she was engaged in purely recreational activity:  she was out for an evening walk on a college campus, after curfew, with another student who was a friend.  Second, as to her broader activities at West Point, she was a student attending college:  she was taking classes, participating in extracurricular activities, and learning to grow up and to be a self-sufficient and healthy individual.  She was not a soldier on a battlefield or military base.  She was not traveling in a military car or boat or plane or pursuant to military orders.  She was not being treated by military doctors.  She was not on duty or in active service or on active status, and she was not yet obliged to enter into

---

flight navigator.  *Id.* at 56.  On the way back, while traveling in a military vehicle driven by a Marine Corps sergeant, she was injured.  *Id.* at 55-56.  We concluded, not surprisingly, that the student's injuries were sustained incident to service.  *See id.* at 58-61.  While Wake was indeed a student, she was on a "temporary duty" assignment and was traveling in a military vehicle driven by an active service member.  Moreover, she received military benefits for her injury -- she "was assigned a 100% disability rating from the [Veterans Administration] on January 5, 1993, resulting in monthly VA service-connected compensation benefits of approximately $2,000 per month."  *Id.* at 62.

22

military service. There was "nothing characteristically military" about what she was doing, and her injuries did not arise out of military employment.

To be sure, West Point serves, to some extent, a military purpose, and its cadets are indeed being trained to be soldiers and officers. As the Government and the majority note, West Point cadets are considered members of the military. Appellants' Br. at 14; Maj. Op. at 18-19 (citing 10 U.S.C. § 3075(a)-(b)(2) (including "cadets of the United States Military Academy" in the "Regular Army," "a component of the Army")). But Doe's status as a member of the military is not, by itself, dispositive. *See Wake*, 89 F.3d at 58-61 (declining to attribute dispositive weight to plaintiff's status as a cadet but looking at all germane circumstances); *Taber*, 67 F.3d at 1053 (holding that *Feres* was not a bar where "[o]ther than the naked fact that Taber was in the Navy at the time of his injury, there is no government/plaintiff relationship of any significance in this case"). Rather, West Point functions principally as a school and Doe was primarily a student; the concerns underlying the Supreme Court's decision in *Feres* and the "special factors counseling hesitation" in the intramilitary immunity cases simply are not implicated here.

First, Doe's claims do not implicate "delicate questions involving military discipline." *Taber*, 67 F.3d at 1049. Her claims do not call into question "the military judgments and decisions that are inextricably intertwined with the conduct of the military mission." *Johnson*, 481 U.S. at 691. The actions and decisions of the individual defendants being challenged here do not implicate, except perhaps in the most abstract sense, military discipline or military judgment or military preparation.[14] Instead, Doe's claims challenge academic decisions and policies, and the individual defendants were acting as educators and school administrators, tasked with providing their students with a positive

---

[14] The Government argues that Doe's claims "call[] into question the management of the military," "specifically their decisions concerning the discipline, supervision, and control of West Point cadets." Appellants' Br. at 10. I suppose that may be so to a degree, but our observation in *Taber* applies here: "Arguably, there is some government/tortfeasor relationship that might entail minimal disciplinary concerns even in this case, but these are both qualitatively and quantitatively different from those that concerned us in [other cases implicating *Feres*], let alone those that troubled the Supreme Court in *Shearer*." 67 F.3d at 1053. Moreover, as amici point out, many graduates of military academies use their degrees to pursue other professional, non-military endeavors immediately after meeting minimum service requirements. *See* Amicus Br. of Former Military Officers at 10 (citing Government Accountability Office study reporting that 32% and 38% of academy graduate officers in, respectively, 2001 and 2005 left in their fifth year, the first year officers were eligible to leave military). While a four-year college degree is required to be commissioned as an Army officer, admission to West Point is not; in fact, in Fiscal Year 2011, only 14.6% of Army officers were commissioned by attending West Point. *See* Amicus Br. of Former Military Officers at 11 (citing Table B-31: Active Component Commissioned Officer Corps, FY 11, http://prhome.defense.gov/Portals/52/Documents/POPREP/poprep2011/appendixb/b_31.html (last visited Aug. 29, 2017).

learning environment, one free from sexual discrimination and harassment. *See*

*VMI*, 518 U.S. at 532 (recognizing right to equal protection in education,

including at a military educational institution); *Hagopian v. Knowlton*, 470 F.2d

201, 210 (2d Cir. 1972) (comparing West Point's responsibility for instilling

discipline in cadets "to the responsibilities of public school teachers to educate

their students").

Second, the "federal system of military death and disability benefits"

established by Congress for injuries sustained by military personnel incident to

service, *Taber*, 67 F.3d at 1049, apparently is not available to Doe. Indeed, now

that her claims against the United States have been dismissed, it appears that her

*Bivens* claim is her only means of seeking relief for her injuries. The Government

has not suggested that Doe is eligible for any benefits akin to workers'

compensation benefits for injuries arising out of activities within the scope of her

military duties.

Third, the district court's decision to permit Doe to proceed with her

federal constitutional claim does not implicate the Court's concern that a

"uniform federal scheme" not be displaced by "the contingencies of local tort

law." *Taber*, 67 F.3d at 1049. Federal constitutional rights are at stake, and "the

fortuity of the situs of the alleged [wrongdoing]" will not dictate whether the individual defendants will be liable. *Johnson*, 481 U.S. at 688. Rather, Doe's equal protection claim is a federal claim, based on federal constitutional law: the Equal Protection Clause of the Fifth Amendment.

Moreover, there are federal regulations that also apply here, and Doe alleges that defendants failed to abide by them. The concern identified in *Feres* and its progeny that courts not interfere with military discipline and structure carries little weight when the military is violating its own rules and regulations. *See Crawford*, 531 F.2d at 1120 (noting that "[a] line of cases in our court holds that actions by the armed services that are violative of their own regulations are within the reach of the courts") (collecting cases); *Hammond v. Lenfest*, 398 F.2d 705, 715 (2d Cir. 1968) (permitting review of petition for writ of habeas corpus where naval reservist claimed he was denied discharge by Navy in violation of its own regulations). Judicial review of Doe's allegations that the individual defendants failed to follow mandatory military directives and regulations would not unduly interfere with "the proper and efficient operation of our military forces." *Smith v. Resor*, 406 F.2d 141, 146 (2d Cir. 1969).

The Government cites three cases that have applied the *Feres* doctrine to dismiss claims brought by service academy cadets. *See* Appellants' Br. at 14 (citing *Miller v. United States*, 42 F.3d 297, 301 (5th Cir. 1995); *Collins v. United States*, 642 F.2d 217, 218 (7th Cir. 1981); *Archer v. United States*, 217 F.2d 548, 552 (9th Cir. 1954)). These out-of-circuit cases, of course, are not controlling, and they are in any event distinguishable. In *Miller*, a freshman midshipman at the Naval Academy was hit in the head by the boom of a sailboat while training to learn, *inter alia*, seamanship and the handling of a small vessel. 42 F.3d at 299. In *Collins*, an Air Force cadet alleged that he was injured by medical malpractice on the part of Air Force medical personnel. 642 F.2d at 218. In *Archer*, a West Point cadet was aboard a United States Army plane returning to West Point from a leave. He was being transported as "a soldier in military service in line of duty" and was killed when the plane crashed. His parents brought a wrongful death action against the United States, alleging negligence in the operation of the plane. 217 F.2d at 549, 551.

These factual scenarios are significantly different from the circumstances before us now. Injuries resulting from training aboard a Navy boat or flying on an Army plane or being treated by military doctors clearly are

injuries incident to service.  None of the cases involved a claim for the violation

of constitutional rights, *see Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (damages

suits "may offer the only realistic avenue for vindication of constitutional

guarantees"), and none involved a claim for the deprivation of the opportunity

for an equal education, or a claim of an injury sustained while socializing with a

classmate.  Moreover, in all three cases, the armed forces provided disability or

death benefits or other compensation.  *Miller*, 42 F.3d at 299-300, 306, 307; *Collins*,

642 F.2d at 221; *Archer*, 217 F.2d at 550.

Finally, the majority and the Government rely on two recent

decisions of other Circuits rejecting *Bivens* claims brought by current and former

service members alleging they had been raped and sexually assaulted by other

service members.  The plaintiffs in these cases contended that the actions and

omissions of current and former Secretaries of Defense had created a military

culture of tolerance for sexual assault and misconduct.  *See Klay v. Panetta*, 758

F.3d 369, 371-72 (D.C. Cir. 2014); *Cioca v. Rumsfeld*, 720 F.3d 505, 513-14 (4th Cir.

2013).  The cases, however, are distinguishable, for they involved active duty

service members who brought broad challenges to policies of high-ranking

government officials, raising questions as to military discipline and command for

28

those in active duty.  The cases did not involve students or an educational institution or the deprivation of meaningful access to an education because of discriminatory academic policies or school administrators tasked with running an educational institution.  The *Feres* concerns -- particularly the question of interfering with military command and discipline -- play out very differently in this scenario.[15]  As Justice Brennan wrote in *Stanley*:

> In *Chappell*, the Court did not create an inflexible rule, requiring a blind application of *Feres* in soldiers' cases raising constitutional claims.  Given the significant interests protected by *Bivens* actions, the Court must consider a constitutional claim in light of the concerns underlying *Feres*.  If those concerns are not implicated by a soldier's constitutional claim, *Feres* should not thoughtlessly be imposed to prevent redress of an intentional constitutional violation.

483 U.S. at 705 (Brennan, J., concurring in part and dissenting in part, with Marshall, J., joining, and Stevens, J., joining in relevant part).

---

[15]    *Klay* and *Cioca* are also distinguishable because they do not employ the fact-specific, totality-of-circumstances approach our Circuit applied in *Taber* and *Wake*. Instead, they rely primarily on one consideration: military discipline and decision-making.  *See Klay*, 758 F.3d at 374-75; *Cioca*, 720 F.3d at 512-15.

# III.

The *Feres* doctrine has been criticized wide and far, and many have called for the Supreme Court to reconsider it.[16]  While we do not, of course, have the authority to overrule *Feres*, we should not be extending the doctrine.  *See Lombard v. United States*, 690 F.2d 215, 233 (D.C. Cir. 1982) (Ginsburg, J., concurring in part and dissenting in part) ("While lower courts are bound by the Supreme Court's decision in *Feres*, they are hardly obliged to extend the limitation . . . .").  By holding that Doe's injuries sustained as a cadet incident to being a student are barred as injuries incident to military service, the majority does precisely that.

---

[16]  *See, e.g., Lanus v. United States*, 133 S. Ct. 2731, 2732 (Thomas, J., dissenting from denial of certiorari) ("I would grant the petition to reconsider *Feres* . . . ."); *Ortiz v. United States*, 786 F.3d 817, 818 (10th Cir. 2015) ("[T]he facts here exemplify the overbreadth (and unfairness) of the doctrine, but *Feres* is not ours to overrule."); *France v. United States*, 225 F.3d 658,  (6th Cir. 2000) (per curiam) ("[M]any courts and commentators have strongly criticized the *Feres* decision."); *Day v. Mass. Air. Nat'l Guard*, 167 F.3d 678, 683 (1st Cir. 1999) ("Possibly *Feres* . . . deserves reexamination by the Supreme Court."); *Bozeman v. United States*, 780 F.2d 198, 200 (2d Cir. 1985) ("The *Feres* doctrine is a blunt instrument; courts and commentators have often been critical of it."); *Taber,* 67 F.3d at 1044 n.11 ("The fact that the doctrine can be made workable does not suggest that the Supreme Court ought not abandon the doctrine completely for reasons akin to those given by Justice Scalia in his *Johnson* dissent."); 14 Charles Alan Wright et al., *Federal Practice & Procedure* § 3658 (4th ed. 2015) ("The *Feres* doctrine has been called 'much-criticized' and 'controversial.'"); Erwin Chemerinsky, *Federal Courts Jurisdiction* 674 (6th ed. 2012) (noting that many commentators and courts have "sharply criticized" the *Feres* doctrine for causing "manifest injustice").

I would affirm the district court's determination that the *Feres* doctrine does not bar Doe's equal protection claim. Accordingly, I dissent.